**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

METRO SPRINGDALE TREATMENT CENTER,
INC., AND MICHAEL DICKERSON                          **PLAINTIFFS**

       **v.**        **Civil No. 09-5037**

ROSEMARY WELLIVER AND
MARVIN LYNN DICKERSON                               **DEFENDANTS**

<u>**MEMORANDUM OPINION**</u>

On the 27th day of January, 2010, the captioned matter came on for trial to the Court.

In their Complaint and Amended Complaint, plaintiffs assert claims for:

* civil conspiracy;

* breach of oral contract;

* tortious interference with contract;

* interference with business expectation;

* unjust enrichment;

* unlawful detainer;

* trespass;

* replevin;

* constructive trust;

* conversion;

* breach of fiduciary duty; and

* "appropriation of likeness."

Plaintiffs seek both compensatory and injunctive relief based on the foregoing claims.

In their counterclaim, defendants allege claims against plaintiffs for breach of oral contract and fraud.

Each side denies the claims of the other.

Both plaintiffs were represented by counsel and both defendants appeared pro se. All parties announced ready for trial, whereupon the Court heard the testimony of witnesses and received documentary evidence, and now makes the following findings of fact and conclusions of law.

<u>FINDINGS OF FACT</u>

1.   This case involves a family quarrel over the financial affairs of a family business which ran aground. Plaintiffs are Metro Springdale Treatment Center, Inc. ("MSTC") and Michael Dickerson ("Michael"). Defendants are Rosemary Welliver ("Rosemary") and Marvin Lynn Dickerson ("Marvin").[1] Marvin is Michael's father, and Rosemary is Marvin's wife.

2.   Michael incorporated MSTC in 2003. He planned to use the corporation to operate a methadone treatment center in Springdale, Arkansas. Michael was the sole incorporator and shareholder and Chairman of the Board of MSTC. According to corporate documents, Rosemary was the Secretary, but all parties referred to her and considered her as both Secretary and Treasurer.

---

[1]For the sake of convenience, the Court will refer to the individual parties by their given names, because one of the plaintiffs and one of the defendants have the same last name.

3.   Marvin helped Michael form MSTC on-line, and paid the filing fee with his credit card, but his name does not appear on any of the MSTC corporate documents.  This appears to be because Marvin had a drug conviction and the DEA would not authorize a methadone treatment center in which he was involved.  It is clear, however, that from the start Marvin was fully involved in all aspects of MSTC, and that the parties treated the corporation as "a family business," disregarding corporate formalities.

4.   MSTC failed to obtain the necessary government permits to operate a methadone treatment center, and Michael and Marvin decided to use the corporation as a vehicle to operate some other business. It was Michael's understanding that Marvin would help financially with the start-up of the business, but they did not discuss ownership.

5.   In the Spring of 2005, it came to the attention of Michael and Marvin that the medical practice of Dr. Stephan Van Ore ("the Practice"), located in Springdale, Arkansas, was in trouble due to Dr. Van Ore's health problems.

6.   On May 21, 2005, Michael and Marvin bought the Practice, including its fixtures and furnishings, its patient charts and records, and the right to use "the names and titles" used by Dr. Van Ore in his business.  The purchase price was $5,000, and Michael and Marvin each paid half.  Michael testified that he was "acting as the corporation" when he bought in to the Practice, although no documents support this.  Marvin testified that the

-3-

corporation was no part of the purchase, but that corporate bank accounts were used to "clear" payments coming in from the Practice.

7.   Michael and Marvin commenced to operate the Practice on May 30, 2005, using contract medical employees to provide general medical services.  Neither Michael nor Marvin drew a salary from MSTC, but the corporation paid their expenses and provided them with housing.  It also provided Michael with a car -- a Dodge Charger titled in the name of MSTC.  Marvin co-signed the financing papers in connection with the purchase of the Dodge.

8.   MSTC patient fees were paid in all the usual ways, including cash, personal check, credit card, and insurance billings, but by far the largest proportion of the fees were electronically billed to Medicaid and Medicare.  Medicaid and Medicare billing required the billing party to have a "provider number," and payment was made by wire transfer to the account of the billing party.

9.   A number of "billing entities" were used by the Practice, including Dr. Van Ore, Med Check First, Lake Harrison Clinic, and Ozark Family Practice.  For the first year, bills were submitted under Dr. Van Ore's provider number, but eventually MSTC obtained a provider number and began to bill using it sometime in 2006. There was some evidence that monies were diverted away from MSTC coffers during the time before MSTC began to bill under its own provider number, but the problems that led to this litigation

relate to the time after MSTC began billing under its own provider number.

10.   Several different electronic billing systems were tried by MSTC.  Michael was ultimately responsible for billing, but the actual work was done by clerical people known as "billing coordinators."  There were problems with the electronic billing, and the business did not cash flow as expected by the individual parties.

11.   In June, 2005, Rosemary loaned money to MSTC, placing $51,000 into an MSTC bank account.  This money was not documented as a loan in the corporate books, but the Court finds that it was such.  Rosemary so characterized it in her testimony, and Michael so characterized it in a letter to attorney Westbrook Doss.  At the time of trial, Michael was not aware of any payments having been made on this loan, but Rosemary testified that it had been paid down to about $40,000 by monthly checks from MSTC to Countrywide Bank, where she had obtained the funds.

12.   In November, 2005, Michael and Marvin became aware of a house for sale, located at 127 Woodcliff Drive in Springdale ("the House"), and the two made an offer to purchase it.  They were not able to obtain financing, however, and the deal fell through.

13.   Marvin then approached Rosemary about buying the House. Rosemary was able to obtain financing, and the House was purchased and financed in her name.

14.  The parties gave very different descriptions of the transaction involving the House.

(a)  Michael testified that MSTC actually funded the down payment, by issuing six checks for $5,000 -- three made payable to Michael for "expenses" and three made payable to Marvin for "expenses" -- which were used to "gather the funds" for the down payment.  There is, however, nothing in the corporate books documenting that these expense checks related to the purchase of the House, and all parties agreed that MSTC did reimburse Michael and Marvin for expenses, which would be consistent with these checks.

According to Michael, the House was to be owned one half by himself/MSTC and one half by Marvin and Rosemary;  MSTC was to make the mortgage payments; and Marvin and Rosemary were to receive half ownership in return for Rosemary obtaining the financing.  In addition, Michael testified that if MSTC could not make any given mortgage payment, Marvin and Rosemary would have been responsible for it.

(b)  Rosemary testified that Marvin really wanted the House, and when he and Michael could not obtain financing, he prevailed on her to buy it "as an investment."  She testified that she withdrew the money for the down payment from a retirement account. Rosemary testified that she made an agreement -- with Marvin -- for MSTC to lease the House for $5,000 per month, which was sufficient to make the mortgage payments.  She was comfortable with this oral lease

-6-

agreement with Marvin, even though Marvin had no formal relationship with MSTC, because "it was family."

(c)  Marvin corroborated Rosemary's version of the purchase of the House, and testified that the purchase was a good investment, because Rosemary was able to buy the House for about 40% of what it was worth.

15.  The Court credits the version of the House purchase given by Rosemary and Marvin, because it is in closer accord with the documentary evidence and has more basis in common sense.  The purchase was made in Rosemary's name and financed by Rosemary, and the checks said by Michael to represent the down payment were notated as expense checks, with nothing in the corporate books to contradict this notation.  In addition, the Court believes it is unlikely that Michael would give half ownership in a house costing over $400,000 to someone who put no money in it but merely acted as a straw man to obtain financing.

16.  All parties agreed that the House would be used by MSTC as housing for agents and employees of the Practice, and it appears that the primary occupants were Michael and his wife Laura; Marvin; Marvin's other son, Marvin, Jr.; and consultants and doctors who came from out of town to work in the Practice.

17.  MSTC made payments to PHH, the mortgage holder on the House, more or less regularly through August 1, 2007.  When MSTC failed to make the full mortgage payment, a corporation owned by

Rosemary sometimes made up the difference.  The evidence showed that a total of $53,758.14 was paid to PHH by MSTC.

18.  On or about December 1, 2006, Michael invested $50,000 in  MSTC.  On or about May 1, 2007, Michael invested another $50,100.00 in MSTC by way of two checks -- one in the amount of $35,100.00 and the other in the amount of $15,000.00.  This $100,100.00 was part of $105,121.61 he had received by way of an inheritance from his grandmother. These deposits were not reflected on the corporate books as either a loan or a stock purchase. Michael, himself, did not characterize these investments as loans but he did testify that he expected "to be paid back".

19.  By January, 2007, the cash flow problems of the Practice were becoming pressing.  Michael testified that they were "looking for a wire transfer from Medicare in the amount of $19,516.55, and that this finally came in.  The documentary evidence reflected, however, that the wire transfer to MSTC came -- not from Medicare -- but, rather, from Michael's own personal bank account.  This fact was unknown to Marvin and Rosemary until litigation commenced.

20.  The Practice was still not cash flowing by the summer of 2007.  Michael continued to take the position that this was a billing problem, and he moved to Wichita, Kansas (where Rosemary and Marvin lived) to "focus" on billing without the "distractions" of operating the Practice.  Marvin, for his part, thought the cash flow problem was related to someone stealing money, and Michael was

one suspect he had in mind.  Marvin testified, however, that he had no proof that Michael stole any money.

21.  At some point -- it is not clear whether this took place in 2006 or 2007 -- billing began to be submitted under another yet another name, Metro Springdale Med Center, Inc. ("MSMC").  This definitely appears to have begun at least by August, 2007.

22.  On August 21, 2007, Michael approached Rosemary in Wichita and requested that the terms of ownership on the House be reduced to writing.  Rosemary directed Michael to speak with his father about the matter.

23.  The discussion between Michael and Marvin did not go well.  In fact, the two came to blows.  Michael immediately left Wichita; went to Springdale and closed two of MSTC's four bank accounts; and moved to Florida and thereafter had no further direct contact with Marvin.  However, he hired a lawyer to write Rosemary and demand a "settlement" on the House issue.  The letters from the lawyer -- which referenced a different piece of property -- were intercepted by Marvin and never received by Rosemary.  No response was made to the letters.

24.  After leaving for Florida, Michael took no further part in the operation of the Practice, and took no further action vis a vis MSTC other than to remove Rosemary as Secretary/Treasurer in January, 2008.  In essence, he abandoned both the Practice and MSTC.

-9-

25.  Marvin continued to operate the Practice until this lawsuit was filed in January, 2009.  He set up yet another corporation, BCI Health Management Systems, Inc., d/b/a MSTC, and opened a new bank account, in which he deposited payments received for services rendered by the Practice.

26.  MSTC or the Practice (it is not clear which) kept the lease on the House until March, 2009.  Rosemary still owns the House.  At some point, Marvin and Rosemary took over the payments on the House.

27.  Of the three items of personal property sought to be replevied by Michael, the Dodge Charger has been repossessed; the Toyota Corolla was last seen in a repair shop; and the whereabouts of Michael's college diploma are unknown.

<u>CONCLUSIONS OF LAW</u>

28.  This matter is before the Court on the basis of diversity jurisdiction, plaintiffs being a Delaware corporation with its principal place of business in Arkansas and an individual resident of either Arkansas or Florida, and defendants being residents of Kansas.  More than $75,000 is in controversy.  The Court applies Arkansas law to a resolution of the issues presented.  **<u>Erie R. Co. v. Tompkins</u>, 304 U.S. 64 (1938)**.

29.  As previously noted, plaintiffs' Complaint and Amended Complaint make allegations of civil conspiracy, breach of oral contract, tortuous interference with contract, interference with business expectation, unjust enrichment, unlawful detainer,

trespass, replevin, constructive trust, conversion, breach of fiduciary duty, and "appropriation of likeness." Both compensatory and injunctive relief are sought.  Defendants allege breach of oral contract and fraud, and seek damages.

30.  Plaintiffs' Claims of Civil Conspiracy:

Under Arkansas law, civil conspiracy is defined as:

a combination of two or more persons to accomplish a purpose that is unlawful, or oppressive, or to accomplish some purpose, not in itself unlawful, oppressive, or immoral, but by unlawful, oppressive, or immoral means, to the injury of another.

**Mason v. Funderburk**, **247 Ark. 521, 529, 446 S.W.2d 543, 548 (Ark. 1969)**.  Civil conspiracy is not "actionable in and of itself, but a recovery may be had for damages caused by acts committed pursuant to the conspiracy." **Faulkner v. Arkansas Children's Hospital**, **347 Ark. 941, 961, 69 S.W.3d 393, 406 (Ark. 2002)**.

It will be seen from the remainder of this Opinion that the Court finds no injury sustained by either MSTC or Michael on any pleaded cause of action.  That being the case, their claim for civil conspiracy fails.

31.  Plaintiffs' Claim for Breach of Oral Contract:

Plaintiffs' claim for breach of oral contract is based on the theory that there was an oral contract between MSTC and Rosemary, whereby the House would be purchased in Rosemary's name, with the down payment and monthly payments to be made by MSTC, and the

property to be owned in undivided shares, half by MSTC/Michael and half by Marvin and Rosemary.

Under Arkansas law,

[u]nless the agreement, promise, or contract, or some memorandum or note thereof, upon which an action is brought is made in writing and signed by the party to be charged therewith, or signed by some other person properly authorized by the person sought to be charged, no action shall be brought to charge any . . . [p]erson upon any contract for the sale fo lands, tenements, or hereditaments, or any interest in or concerning them. . . .

**A.C.A. §4-59-101.**

In the case at bar there is no written evidence whatsoever of an agreement between Michael or MSTC and Rosemary that the House would be owned jointly, and thus no suit can be maintained to establish that proposition.  That being the case, plaintiffs' claim for breach of oral contract fails.

32.  Plaintiffs' Claim for Tortious Interference with Contract:

Plaintiffs' claim for tortious interference with contract is also without merit, given that the underlying contract cannot be proven.

33.  Plaintiffs' Claim for Interference With Business Expectation:

Plaintiffs' claim that defendants interfered with MSTC's business expectancy in the use of the House requires MSTC to show that it had a valid business expectancy in the use of the House;

that Rosemary and Marvin knew of that business expectancy; that Rosemary or Marvin intentionally and improperly induced or caused a disruption or termination of that business expectancy; and that MSTC was damaged by such disruption or termination. **AMI 403.**

The evidence showed that MSTC had a business expectancy that it could use the House as a residence for agents and employees of MSTC, and that all parties were aware of this business expectancy. There was no showing that this expectancy was ever disrupted or terminated. Michael, Marvin, and various doctors employed by MSTC all lived in the House from time to time, even after Michael left the Springdale area in August, 2007. The evidence showed that the House continued to be leased to and used by MSTC as long as MSTC continued operations.

Because there is no showing that any business expectancy of MSTC was disrupted or terminated, this claim is without merit.

34. <u>Plaintiffs' Claim for Unjust Enrichment</u>:

An action based on unjust enrichment "is maintainable where a person has received money or its equivalent under such circumstances that, in equity and good conscience, he or she ought not to retain [it]." **<u>DePriest v. AstraZeneca Pharmaceuticals, L.P.</u>, 2009 Ark. 547, --- S.W.3d ---, 2009 WL 3681868 (2009).** Plaintiffs claim that Rosemary has been unjustly enriched by MSTC's payment of the mortgage on the House.

The credible evidence on this issue is that the payments made from MSTC accounts toward the mortgage on the House were lease payments, albeit made directly to the mortgage-holder, in return for which MSTC received housing for its agents and employees. While Rosemary's and Marvin's testimony as to the lease implicates very sloppy business practices -- i.e., a verbal lease entered into by the Secretary of a corporation with one who on paper was a stranger to the corporation -- it is clear that throughout the time they did business together the parties disregarded MSTC's corporate form and treated Marvin as a decision-maker in MSTC. When the Court factors in the evidence that the House was bought in Rosemary's name and the financing was obtained in her name, it credits the evidence that the House was leased to MSTC for members of Michael's and Marvin's family to live in while working in the Practice or for MSTC.  Thus, Rosemary was not unjustly enriched by receiving lease payments for the House.

35.  <u>Plaintiffs' Claim for Unlawful Detainer & Trespass</u>:

Plaintiffs' claims for unlawful detainer and trespass are without merit.  Marvin is alleged to have unlawfully detained the House, and to have trespassed thereon, but given the Court's conclusion that he had a right to be on the property, and that he did nothing to prevent Michael from using it, these claims are without merit.

36.  <u>Plaintiffs' Claims for Replevin</u>:

Plaintiffs' claim for replevin is also without merit.  By this claim Michael seeks return -- from Rosemary or Marvin -- of two cars (a 1995 Toyota Corolla and a 2006 Dodge Charger) and a college diploma.  The evidence showed that neither Rosemary nor Marvin had possession of the two cars in question, and that the whereabouts of the college diploma are unknown.

37.  <u>Plaintiffs' Claim for Constructive Trust</u>:

Plaintiffs seek to impose a constructive trust on the House. The Arkansas Supreme Court has explained that

> [a] constructive trust is imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it.  A constructive trust may be imposed when the elements necessary for constructive fraud are not present;  it is not necessary to show a material misrepresentation of fact to recover under the theory of constructive trust. The duty to convey the property may arise because it was acquired through fraud, duress, undue influence or mistake, breach of a fiduciary duty, or wrongful disposition of another's property. A constructive trust normally arises without regard to the intention of the person who transferred the property.

**<u>Cox v. Miller</u>, 363 Ark. 54, 65, 210 S.W.3d 842, 848-49 (2005)** (internal citations omitted).

Put in terms of this case, to recover on this theory plaintiffs would have to persuade the Court that Rosemary would be unjustly enriched if she were allowed to retain title to the House.  As explained in ¶34, the evidence does not justify such a finding.

-15-

38.   <u>Plaintiffs' Claim for Conversion</u>:

Plaintiffs' conversion claim requires proof that MSTC was entitled to possession of payments made in respect of its billings, and that Marvin or Rosemary took control of those payments in violation of the rights of MSTC. **AMI 425.**

While there is no question that MSTC was entitled to payments for its billings, the Court concludes that Michael abandoned both MSTC and the Practice in August, 2007, and that Marvin operated the Practice, using the names Metro Springdale Med Center, Inc., and BCI Health Management Systems, Inc. d/b/a MSTC, thereafter.  Given the Court's further conclusion that Marvin was an integral part of the business operations of MSTC, and that the parties disregarded its corporate form and operated merely "a family business," Marvin's operation of the Practice, and his deposit of checks for billings of the Practice -- under whatever billing entity -- do not constitute conversion.

39.   <u>Plaintiffs' Claim for Breach of Fiduciary Duty</u>:

Plaintiffs' claim for breach of fiduciary duty requires proof that Marvin or Rosemary owed a fiduciary duty to MSTC, and breached that duty.

Under Arkansas law, "an officer or director of a corporation owes a fiduciary duty to the corporation and its shareholders." This duty requires that the officer or director act in good faith, with ordinary care, and in a manner which he or she reasonably believes to be in the best interests of the corporation." **Wal-Mart**

-16-

**Stores, Inc. v. Coughlin**, 369 Ark. 365, 369-70, 255 S.W.3d 424, 428 **(Ark. 2007)**.

Because Marvin had no formal office with MSTC, plaintiffs' breach of fiduciary duty claim against him must fail. Rosemary, as Secretary, had a fiduciary duty to MTSC, but the Court finds no evidence that she breached it. There is no proof that any of her conduct -- from loaning the corporation money to leasing the House to the corporation -- was done without a reasonable belief on her part that it was in the best interests of MSTC.

40.  Plaintiffs' Claim for "Appropriation of Likeness":

Plaintiffs' claim for injunctive relief alleges that Marvin "has usurped apparent and actual control of the Plaintiff corporation," and seeks to restrain him from continuing to do so. This appears to be related to plaintiffs' claim of "appropriation of likeness," and the Court concludes that both are without merit. As has been noted herein, all parties ignored the corporate form of MSTC and operated the Practice as a family business, using MSTC (and later MSCM) only as facades to obtain provider numbers and open bank accounts to clear payments. Marvin was fully involved in the business affairs of both MSTC and the Practice. Michael abandoned the corporation in August, 2007, leaving Marvin to conduct its business affairs, and had no further contact with Marvin until suit was filed in January, 2009.

Under these circumstances, it would be an abuse of the corporate form to grant Michael any relief on his claim of "usurpation" or "appropriation." The substance of the matter is that Michael abandoned the Practice and Marvin continued to operate it. The Practice is now closed, but even if it were not, the Court finds there would be no basis to enjoin Marvin from operation of the Practice.

41. <u>Defendants' Claim for Breach of Oral Contract</u>:"

Defendants claim that Michael breached an oral contract with them. While the nature of such oral contract is not clearly alleged in their Counterclaim, it is said to have to do with an agreement "to provide labor, business equipment, and professional expertise" to Michael, and with placing money "in the complete control" of Michael.

The Court finds no merit in this claim. Under Arkansas law, for a valid contract to exist, "all terms should be definitely agreed upon, and the terms must be 'reasonably certain.' Terms are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." **Key v. Coryell**, 86 Ark. App. 334, 341, 185 S.W.3d 98, 103 (Ark. App. 2004) (internal citations omitted).

There is evidence that Rosemary loaned money to MSTC, but no evidence of any agreement relating time of repayment, amount of interest, or amount of payments. There is also evidence that both

-18-

Marvin and Rosemary worked for MSTC and its various iterations, but no evidence of the terms of such labor.  In the absence of such evidence, there is not sufficient certainty to determine the existence of a breach, or to give an appropriate remedy.  The Court cannot determine what compensation was agreed upon for the services of Marvin or Rosemary, or even if there was any such agreement.

Nor can it determine how much was repaid to Rosemary of the money loaned, and why more was not paid.  There was evidence that between November, 2005, and August, 2007, MSTC paid $8,500.00 toward this loan.  The evidence further shows that after Michael left, Marvin and Rosemary operated the business of MSTC from August, 2007, until January, 2009.  During this time they had the opportunity, should they have so chosen, to make payments on the loan, but there was no showing as to how much, if any, was paid on it or could have been paid.

42.  Defendants' Claim for Fraud:

Defendants' claim for fraud is also without merit.  To establish fraud, defendants must prove that Michael made a false representation of material fact; that he either knew or believed that the representation was false or knew or believed that he did not have sufficient information to make the representation; that he intended them to rely on the representation; that they did justifiably rely on the representation; and that they sustained damages as a result.  **AMI 402.**

The alleged fraud is said to lie in the use of "hidden" billing practices and cashing checks made out to the various billing entities of the Practice in unknown bank accounts, such that Michael deceived defendants "in matters regarding cash flow."

There was evidence that Michael was ultimately responsible for billing at the Practice, and that money was diverted from the Practice, but the only evidence of falsehood on the part of Michael himself which was relied upon by the defendants was Michael's statement that a Medicare wire transfer in the amount of $19,516.55 had been received. In fact, Michael himself had made a wire transfer in that amount from his personal account to an MSTC account.

Defendants justifiably relied on this to support their expectation that the electronic billing system was finally "hooked up," and would finally start paying off, but there is no evidence of any damages sustained as a result. While money did not start to flow in from Medicare, there is no proof as to why it did not, nor any proof as to how much money might have been diverted. The Court cannot engage in speculation about these issues, and cannot grant any recovery in the absence of proof.

<u>CONCLUSION</u>

43. This case involves a family quarrel over the financial affairs of a family business. In such a case, it seems incongruous for that family to be, as here, essentially suing itself. Families -- rightly and properly -- do many things for their members which

-20-

are not based upon legal contracts or arrangements, but which are based upon the strength and vitality of the familial relationship. However, when a family conducts business as a family, and not as a properly set-up and operated business entity, it should not be surprising that there may not be any legal recourse available when the enterprise fails.

That is the case here. If the family members had utilized appropriate business practices in dealing with MSTC and each other, their business might well have succeeded, but even if it had failed, the legal rights and obligations of the parties could have been ascertained and adjudicated. They did not so operate their business, and the Court finds insufficient evidence to support any of the claims made by any of the parties in this case. For this reason, the claims of all parties will be dismissed by separate Judgment entered concurrently herewith.

**IT IS SO ORDERED**, this 12th day of February, 2010.

> **/s/Jimm Larry Hendren**
> **JIMM LARRY HENDREN**
> **UNITED STATES DISTRICT JUDGE**